UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ESLEITHER JUNIOR LUNA VARGAS,<br><br>Petitioner,<br><br>v.<br><br>DAVID WESLING et al.,<br><br>Respondents. | ) | Civil No. 26-14169-LTS |

MEMORANDUM AND ORDER ON MOTION TO ENFORCE (DOC. NO. 15)

November 9, 2026

SOROKIN, J.

Esleither Junior Luna Vargas, a citizen of the Dominican Republic, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging his immigration detention. After reviewing the petition and response, the Court ordered respondents to provide Luna Vargas with the bond hearing to which he was entitled under 8 U.S.C. § 1226(a). Now, he challenges the constitutional adequacy of his bond hearing and seeks immediate release or a new bond hearing. For the reasons and to the extent explained below, the motion is ALLOWED.

## I. BACKGROUND

Luna Vargas, a citizen of the Dominican Republic, entered the United States without inspection in 2022. Doc. No. ¶ 1. An asylum officer found he had demonstrated a credible fear of persecution or torture, and he was released on parole. Doc. Nos. 1-7, 15-3. A notice to appear issued, but his case was not calendared before the immigration court. Doc. No. 1 ¶ 2; Doc. No. 1-7. For the next several years, Luna Vargas lived in Massachusetts; in 2025, he married a United States citizen, and in April 2026, the couple welcomed a United States–citizen daughter.

Doc. No. 15-3 at 27, 36. In 2025, Luna Vargas and his wife submitted Forms I-130 and I-485—steps for him to become a lawful permanent resident—and those applications remain pending. Id. at 24–25.

In April 2024, a police officer in New Hampshire conducted a traffic stop of Luna Vargas's vehicle. Doc. No. 18-1 at 58. According to the police report, while talking to Luna Vargas, the officer noticed two identity cards in his vehicle: a green card displaying Luna Vargas's picture and the name "Carlos Herrera," and a Social Security card with the name "Carlos Herrera" and a Social Security number belonging to a Massachusetts woman in her sixties. Id. The police report contains no information about how Luna Vargas obtained these documents, nor how (if at all) he used them. See id. Luna Vargas was arrested and charged with manufacturing/possessing a false ID, identity fraud, and several vehicle-related violations. Doc. No. 15-3 at 38. He pleaded guilty to the misdemeanor charge of manufacturing/possessing a false ID and received a suspended sentence of ninety days, conditioned on one year of good behavior. Id. at 40. The record indicates Luna Vargas completed his one-year probationary period without incident. The other charges were nolle prossed. Id. Luna Vargas has no other criminal history in the record before the Court.

On the morning of September 10, 2026, ICE officers arrested Luna Vargas in his vehicle after observing him leave his home. Doc. No. 18-1 at 51. According to the ICE officers' report, the officers activated their lights and sirens, pinned Luna Vargas's vehicle on three sides, and approached while saying "stop, police," "roll down the windows," "unlock the doors," and "put your hands on the dashboard." Id. When he allegedly failed to comply with these commands, the officers "were required" to "break the driver's side window to remove [Luna Vargas] from the vehicle." Id. Luna Vargas's counsel argues that any noncompliance was the result of the

confusion caused by the officers' multiple, competing commands, not willful defiance. Doc. No. 15-1 at 6.

On the same day as his arrest by ICE, Luna Vargas filed the instant habeas petition and moved for a TRO/preliminary injunction.[1] Doc. Nos. 1, 2. On September 16, 2026, the Court ordered the respondents to provide Luna Vargas a bond hearing pursuant to 8 U.S.C. § 1226(a), at which the burdens of proof were as established by governing First Circuit precedent. Doc. No. 11. After a bond hearing, an immigration judge ("IJ") denied bond after concluding the government had shown Luna Vargas posed a danger to the community by clear and convincing evidence. Doc. No. 14. On October 12, Luna Vargas filed a motion seeking immediate release or a new bond hearing, arguing his bond hearing was constitutionally inadequate in violation of the Court's habeas order. Doc. No. 15. The motion is ripe for resolution. Doc. Nos. 17, 19.

## II. DISCUSSION

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Outside of criminal proceedings, government detention is authorized only in "certain special and narrow nonpunitive circumstances." Id. (citation modified). Civil immigration detention, which is not punitive, must bear a "reasonable relation" to its regulatory purposes: ensuring the noncitizen's appearance at immigration proceedings and preventing danger to the community. Id. at 690–91. As relevant here, to continue detaining a noncitizen under 8 U.S.C. § 1226(a), due process requires that the government show, by clear and convincing evidence, that the noncitizen "poses a danger to the community." Hernandez-

---

[1] Luna Vargas's TRO/PI motion challenged his confinement at the Burlington Field Office, Doc. No. 2, and was rendered moot by his subsequent transfer to the Plymouth County Correctional Facility, see Doc. No. 13. Accordingly, the TRO/PI motion is DENIED AS MOOT.

Lara v. Lyons, 10 F.4th 19, 41 (1st Cir. 2021); see also Zadvydas, 533 U.S. at 690–91 (noting that Supreme Court has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections").

"The clear and convincing standard is a demanding standard to satisfy." Miti v. Moniz, 827 F. Supp. 3d 206, 218 (D. Mass. 2026) (quoting United States v. Anonymous Appellant, 85 F.4th 576, 580 (1st Cir. 2023)), appeal filed, No. 26-1655 (1st Cir. June 8, 2026). As this Court has reiterated: "Adjudicating whether to detain or release another person is one of the most serious tasks judges are asked to perform. It requires conscientious review and consideration of all relevant and available information." Atariguana-Buele v. Warden, Plymouth Corr. Facility, No. 26-cv-12168-LTS, 2026 WL 1825934, at *2 (D. Mass. June 25, 2026) (emphasis in original); accord, e.g., Quinonez Perez v. Wesling, No. 25-cv-13445-LTS, 2026 WL 2731085, at *4 (D. Mass. Sep. 16, 2026) (collecting cases).

The dangerousness inquiry "will naturally tend to begin with the government offering a reason to find a particular person dangerous . . . [a]nd that reason will in most cases be based on law enforcement records." Hernandez-Lara, 10 F.4th at 31. Prior criminal conduct plainly bears on the question of dangerousness. Still, the question before an IJ in a § 1226(a) bond hearing is not (or not only) whether the noncitizen has committed a criminal or dangerous act in the past. Immigration detention is not "a punitive 'consequence' for actions addressed in the state criminal court." Ercelik v. Hyde, No. 1:25-cv-11007-AK, 2025 WL 1361543, at *13 (D. Mass. May 8, 2025). Instead, prior bad conduct, considered alongside other pertinent evidence, informs the IJ's analysis of the core question: Does the noncitizen presently pose a danger to the community, if released, such that civil detention is needed to protect the community? This distinction—between assessing whether a noncitizen committed a crime in the past and determining whether

that person poses a danger to the community now—is a crucial one. It ensures that civil immigration detention reasonably relates to its legitimate purposes: to protect the community and ensure participation. And it ensures such detention is not wielded to punish for past misbehavior.

This case illustrates the risk that past criminal conduct may be used to justify civil immigration detention without examining whether the noncitizen poses a danger now—let alone one that no alternatives short of detention could mitigate.

In a written decision issued on September 24, the IJ denied Luna Vargas bond after finding the government proved he posed a danger to the community by clear and convincing evidence and that "there are no conditions or combination of conditions that would reasonably ensure the safety of the community." Doc. No. 14-1. The IJ's "danger" finding was based solely on Luna Vargas's 2024 arrest and conviction for manufacturing/possessing a false ID and the associated police report. Id. at 5–6.

The IJ reasoned that Luna Vargas's "use of false immigration documents shows a blatant disregard for the laws of the United States and an attempt to circumvent lawful immigration procedures" and that his "misrepresentations raise safety and security concerns." Doc. No. 14-1 at 6 (citation modified). The IJ recounted the basic facts from the police report—a report that contains no information about how Luna Vargas obtained or used the false identification documents in question. Id. at 5–6; see also Doc. No. 18-1 at 58 (police report). The IJ's opinion did not explain what factual allegations, in the police report or otherwise, established that Luna Vargas "use[d]" false immigration documents to "attempt to circumvent lawful immigration procedures." The IJ's bond decision cited two BIA opinions with, it appears, markedly different facts from this case: one involving a noncitizen with two prior convictions for illegal reentry and

evidence that she had twice "lied to Immigration Officers" that she was a United States citizen and "presented her United States citizen daughter's birth certificate and identification as her own," Matter of C-M-M-, 29 I. & N. 141, 143 (BIA 2025), and one involving a noncitizen who knowingly used a fraudulent passport, stolen from a national government by a terrorist organization, to enter the United States, Matter of Fatahi, 26 I. & N. 791, 794 (BIA 2016). No similar evidence exists in this case. That is, there is no evidence whatsoever, as there was in Fatahi, of a connection to an armed terrorist organization at war with the United States.

More to the point, the IJ's decision also did not elaborate why Luna Vargas's possession of false documents, more than two years ago, means he presently poses a safety or security risk justifying civil detention now. His conviction took place more than two years before his arrest by ICE. In the intervening two years, Luna Vargas married a United States citizen, filed applications with USCIS to adjust his status, and welcomed a United States–citizen daughter. His pursuit of a lawful pathway to citizenship tends to undermine the conclusion that Luna Vargas presently poses a security or safety risk related to false immigration documents. The IJ's decision did not discuss Luna Vargas's pending applications or how his changed circumstances since his 2024 conviction affect analysis of his present dangerousness. See Doc. No. 14-1.

On this record, the IJ's conclusion—that Luna Vargas poses a danger to the community, and one that no conditions could mitigate—might have rested on one of several unarticulated premises. One is that any noncitizen who previously possessed a false immigration-related document *per se* poses a danger to the community. That claim stretches beyond their constitutional limits the BIA opinions the IJ's bond order cited. Another is that Luna Vargas does not "deserve" to be released from detention because of his 2024 conviction—a state

misdemeanor for which he served no jail time.[2] This view would impermissibly impose civil immigration detention as punishment.

Perhaps the government could have proved, by clear and convincing evidence, that Luna Vargas presently poses a danger to the community, and that no alternatives or conditions could mitigate it, even though his circumstances have changed since his misdemeanor conviction. Certainly, Luna Vargas's prior possession of false immigration documents is not a trivial matter and is material to the bond determination. But in deciding whether the government could constitutionally continue to detain Luna Vargas, the IJ was required to consider all relevant and available information, including by grappling with the tension between his prior bad conduct and his subsequent and present changed circumstances.

For all these reasons, Luna Vargas did not receive a bond hearing that satisfied the Constitution's due-process guarantee. The Court concludes, however, that the appropriate relief under these circumstances is for the respondents to provide Luna Vargas a new bond hearing that accounts for the constitutional principles described in this opinion.

---

[2] In its evidence package submitted to the IJ, the government included a Form I-831, completed by a deportation officer, that says the state court "sentenced [Luna Vargas] to 9-12 months confinement." Doc. No. 18-1 at 53. Similarly, respondents' opposition brief, filed by the United States Attorney's Office, states that Luna Vargas's history shows "several arrests related to false identifications" including one "for which [p]etitioner received a jail sentence of 9-12 months." Doc. No. 17 at 3–4. Both of these assertions are flatly contradicted by the original state-court documents in the record. The record before the Court (and before the IJ) shows a single arrest resulting in several charges, all but one of which were nolle prossed, and a single misdemeanor conviction resulting in a ninety-day suspended sentence. Doc. No. 15-3 at 38–41; Doc. No. 18-1 at 45. In other words, absent additional reliable evidence not presently in the record, the Form I-831 and the opposition brief erroneously describe the state sentence. It is not clear whether this error was material to the bond decision; the IJ's decision does not specifically address Luna Vargas's suspended sentence.

## III. CONCLUSION

For the foregoing reasons and to the extent described above, the motion to enforce, Doc. No. 15, is ALLOWED. Respondents shall conduct a new bond hearing by **November 16, 2026**. Respondents shall file a status report by November 20, 2026, regarding their compliance with this Order. The motion for a TRO/PI, Doc. No. 2, is DENIED AS MOOT.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge